UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

In Re:                              )
                                    )
Melodie Lea Howard,                 )          Case No. B-20-10498 C-7G
                                    )
          Debtor.                   )

**MOTION TO APPROVE SALE OF REAL PROPERTY AND LLC INTERESTS**

Everett B. Saslow, Jr., Trustee ("Trustee"), pursuant to Section 363 of the Bankruptcy Code, moves the Court to allow a sale of certain real property interests and limited liability company interests and hereby moves the Court pursuant to Rule 9019 of the Rules of Bankruptcy Procedure to approve the Trustee's compromise in this case, and in support thereof shows unto the Court:

1.     The Debtor Melodie Lea Howard ("Debtor" or "Ms. Howard") filed a Chapter 7 Petition on June 1, 2020.

2.     The Trustee is the duly appointed and acting Chapter 7 Trustee in the Debtor's case.

3.     The Debtor's Schedules, Statement of Financial Affairs, and Claims to Exempt Property refer to certain properties which are assets of the Debtor and her estranged husband Yitzhak Miller ("Mr. Miller") jointly.  Mr. Miller and Ms. Howard were not divorced as of the Petition Date.

4.     Mr. Miller and Ms. Howard had purchased during their marriage and still own three parcels of real property, namely, property located at 442 Aldridge Road, Banner Elk, Watauga County, NC; at 23252 Sudie Payne Road, Rodanthe, Dare County, NC; and at 1234 Carondelet Street, New Orleans, LA (hereinafter collectively referred to as the "Jointly Owned Properties").  Further, Mr. Miller and Ms. Howard had formed a company, Flagship Vacation Properties, LLC ("Flagship") for the purpose of operating the Jointly Owned Properties, and both were members of Flagship as of

1

the date of Ms. Howard's Petition, and Ms. Howard and Mr. Miller comprise the sole members of Flagship. Flagship owns a vacation property on Bald Head Island, Southport, Brunswick County, NC at 232 S. Bald Head Wynd.

5.      Mr. Miller and Trustee have entered into a Purchase Agreement for the purchase and sale of the Jointly Owned Properties and the Flagship ownership interests. A copy of the Purchase Agreement is attached hereto and incorporated herein by reference.

6.      Subject to approval of the Purchase Agreement by the Bankruptcy Court, Mr. Miller and Flagship shall purchase the Debtor's interest in the Jointly Owned Properties and in Flagship from the Trustee for the total sum of fifty thousand dollars ($50,000.00) (the "Purchase Amount"), payable in a lump sum at closing. The closing shall occur on a date no more than sixty (60) days following court approval of the Agreement or an amended version of the Agreement.

7.      At closing, in exchange for the Purchase Amount, the Trustee shall deliver to Mr. Miller the following (collectively, the "Transferred Assets"):

a. A quitclaim deed to the property located at 442 Aldridge Road, Banner Elk, NC, transferring all interest of the Debtor in that property;
b. A quitclaim deed to the property located at 23252 Sudie Payne Road, Rodanthe, NC, transferring all interest of the Debtor in that property;
c. A quitclaim deed to the property located at 1234Carondelet Street, New Orleans, LA, transferring all interest of the Debtor in that property;
d. Transfer of Debtor's entire interest in Flagship to Mr. Miller, including any exempted interest. The Purchase Amount shall be allocated among the Transferred Assets in the amount of $12,500 to each of the four Transferred Assets or otherwise as specified by Trustee.

8.      The sale of the Transferred Assets from the Trustee is subject to all liens, encumbrances, claims, or other clouds or defects that might exist. The Trustee is transferring all interest he has in the Transferred Assets, and such transfers are strictly "AS IS." The Trustee makes no representations or warranties as to the titles to the Transferred Assets.

9.      Mr. Miller represents and warrants that he has fully disclosed to the Trustee the financial condition of Flagship, including the minimal cash on hand that Flagship had as of the petition date.  Mr. Miller further represents that Flagship's income since the petition date has been used to pay past due debt of the Company as well as ongoing obligations of the Company to keep the properties in a condition where they can be rented and generate income.  Mr. Miller agrees that, in consideration of the transfer of the Flagship membership interest listed above,  Mr. Miller, who is the majority interest holder in Flagship and will be the sole interest holder in Flagship, will not cause Flagship to issue any Schedule K-1 to the Debtor or the Trustee either for the 2019 or 2020 tax years. Finally, Mr. Miller agrees that Flagship will indemnify the Trustee and/or the bankruptcy estate on the terms set forth in the Purchase Agreement.

10.      Upon delivery of the Transferred Assets as described in the Purchase Agreement, Mr. Miller shall release and hereby releases (1) his participation in any claim for repairs to the Elam Property and his claim for insurance proceeds in connection with the Elam Property including but not limited to the Elam Insurance Claims (as such terms in this paragraph are defined in the Purchase Agreement) and (2) any claims he has to funds derived from equity in the Elam Property.  Therefore, the Trustee can receive from State Farm all sums due or payable by State Farm related to the Elam Insurance Claims.

11.      Upon delivery of the Purchase Amount as defined in the Purchase Agreement, the Trustee releases (1) any claims the Debtor has or might have to repair funds for Mr. Miller's Dodge Challenger, and (2) any claims the Debtor has or might have to the Jointly Owned Properties, the membership interest in Flagship, and/or to any property owned by Flagship.

12.      In the event that Mr. Miller is unable to close and therefore defaults on this Agreement, then Mr. Miller agrees to take all actions necessary to sell, under Trustee's supervision and jointly

with Trustee, of as many Transferred Assets as required to provide $50,000 to the bankruptcy estate in Ms. Howard's bankruptcy case. Further, Mr. Miller's release of claims in Paragraph 5 of the Purchase Agreement shall remain in effect. Notwithstanding the foregoing, Mr. Miller is expressly not in default if he is willing and able to close but is prevented from doing so by the Bankruptcy Court or the Trustee.

13.    Except as expressly stated herein, nothing in the Purchase Agreement shall be construed as a waiver on the part of Mr. Miller of any claim he or Flagship may have against Ms. Howard personally; except that no such claim shall obstruct or interfere with the Bankruptcy Trustee's administration of the Estate. Except as expressly stated herein, nothing in the Purchase Agreement shall be construed as a waiver on the part of Ms. Howard of any claim she may have against Mr. Miller personally or against Flagship.

14.    The Trustee has evaluated the Purchase Agreement and believes it to be in the best interest of Ms. Howard's bankruptcy estate. For the property located at 442 Aldridge Road, Banner Elk, Watauga County, NC, the Trustee submits that an appropriate sales price is $650,000 that the first lien deed of trust claims a payoff of $529,667, and that there are additional liens of $48,719 to High Country and $75,000 to Wynding Down, LLC. For the property located at 23252 Sudie Payne Road, Rodanthe, Dare County, NC; the Trustee submits that an appropriate sales price is $630,000 and that the first lien deed of trust claims a payoff of $520,837. For the property located at 1234 Carondelet Street, New Orleans, LA, the Trustee submits that an appropriate sales price is $720,000; that the first lien deed of trust claims a payoff of $586,052, and that there are additional liens of $4,000 to Robichaux and possible prepayment penalty issues. For the LLC interests in Flagship, the Trustee is reluctant to suggest a sales price for the lot at 232 S. Bald Head Wynd based upon the lot's being "not rebuildable" but reports that the lot's tax value is $550,400 and the original principal

4

secured by the deed of trust was $487,500.  The net worth of Flagship needs to be distributed in accordance with North Carolina law and with the LLC's operating agreement.  While the Debtor points to 50%-50% arrangements under the operating agreement under Schedule 2, Mr. Miller contends that his interest at dissolution is 91.67% based upon relative capital accounts.  A copy of the Operating Agreement received by the Trustee is attached hereto as an exhibit.

15.    The Trustee believes that it is in the best interests of the estate, creditors and other parties in interest to approve the sale provided for by the Purchase Agreement  upon the terms and conditions contained in the Purchase Agreement as it will generate proceeds for the estate for the payment of allowed claims in this case.

16.    This Motion to Approve Sale of Real Property and LLC Interests seeks approval of the sales described in the Purchase Agreement.   Also, the Purchase Agreement involves compromises of the Flagship ownership interests, the insurance proceeds on the Dodge Challenger, and the Elam Insurance Claims.

17.    Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

18.    Rule 9019 authorizes settlements as long as they are fair and equitable and in the best interest of the estate.  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).   "Based upon this policy to favor settlement, the bankruptcy court can approve a compromise over objections so long as the compromise does not fall below the lowest point of reasonableness." *United States ex rel. Rahman v. Oncology Assocs.,*

*P.C. 269 B.R. 139, 149-50 (D. Md. 2001) aff'd. United States ex rel. Rahman v. Colkitt, 61 Fed.*

*Appx. 960 (4th Cir. 2003).*

19.     The Trustee recommends the transaction described in the Purchase Agreement. The Trustee has no means in the bankruptcy estate to make adequate protection payments to secured creditors.  Mr. Miller declined the Trustee's request that the Jointly Owned Properties be listed for sale with realtors, and the Trustee's opinion is that litigation under Code section 363(h) would take too long and is not supported by sufficient claims which are jointly owed by Mr. Miller and Ms. Howard.  With regard to Ms. Howard's ownership interests in Flagship, it appears to the Trustee that while the bankruptcy estate retains its economic interests in Flagship, Ms. Howard and the Trustee may not be able to exercise management rights with respect to Flagship which inhibits the Trustee's realization of value in marketing the LLC interests for sale.

**WHEREFORE**, the Trustee requests from the Court that:

1.     The Court enter an Order approving the Purchase Agreement between Yitzhak Miller and the Trustee.

2.     That the Court authorize the sale of the Jointly Owned Properties and Flagship to Mr. Miller under the Purchase Agreement;

3.     That the Court authorize the Trustee to sign documents as needed with respect to the sales under the Purchase Agreement including signing deeds, signing all sale and transfer documents in ordinary form, and signing all lien affidavits, closing statements and other closing documents as are customary in real estate closing transactions;

4.     That the Motion be set for hearing upon a conditional hearing or no protest basis, if appropriate; and

5.      That Court grant to the Trustee such other and further relief as to the Court seems just and proper.

This the 3rd day of August, 2020.

 s/ Everett B. Saslow, Jr.     
Everett B. Saslow, Jr.
N.C. State Bar No. 7301

OF COUNSEL:
HILL EVANS JORDAN & BEATTY
A Professional Limited Liability Company
Post Office Box 989
Greensboro, North Carolina 27402
Telephone:  (336) 379-1390

EXHIBIT TO MOTION TO APPROVE SALE

## **PURCHASE AGREEMENT**

This AGREEMENT is entered into this 31st day of July, 2020, by and between EVERETT B. SASLOW, JR. in his capacity as Chapter 7 Trustee in the bankruptcy case of Melodie Lea Howard ("Trustee"), United States Bankruptcy Court for the Middle District of North Carolina, Case Number 20-10498 ("Trustee"); and YITZHAK MILLER ("Mr. Miller").

WHEREAS, the Trustee is the duly appointed Chapter 7 bankruptcy trustee in the bankruptcy case of Melodie Lea Howard ("Ms. Howard" or "Debtor"); and

WHEREAS, Mr. Miller is the estranged spouse of Ms. Howard, and the couple was not divorced as of the Petition Date; and

WHEREAS, Mr. Miller and Ms. Howard purchased and owned three parcels of real property during their marriage, namely, property located at 442 Aldridge Road, Banner Elk, NC, Sudie Payne Road, Rodanthe, NC, and 1234 Carondelet Street, New Orleans, LA (hereinafter collectively referred to as the "Jointly-Owned Properties"); and

WHEREAS, Mr. Miller contends that he provided all purchase funds for these properties from like-kind exchange of premarital property, that Ms. Howard secured financing for the properties, and that Flagship made the mortgage payments on these properties prior to Hurricanes Florence and Michael in 2018; and

WHEREAS, the loans on these properties have had foreclosure proceedings instituted and are subject to foreclosure sale but-for the automatic stay of the Bankruptcy Code; and

WHEREAS, Ms. Howard stated in her Petition that she intended to surrender her interest in the Jointly-Owned Properties; and

WHEREAS, Mr. Miller and Ms. Howard had formed a company, Flagship Vacation Properties, LLC ("Flagship") for the purpose of operating the Jointly-Owned Properties, and were each members of Flagship as of the date of Ms. Howard's Petition; and

WHEREAS, Ms. Howard has requested in her Petition that the court exempt $945 of her economic interest in Flagship; and

WHEREAS, Ms. Howard was the cosigner on a loan secured by a Dodge Challenger titled to Mr. Miller (Petition Schedule A/B, Part 2, #3.2), but does not hold title to that asset; and

WHEREAS, the Dodge Challenger was damaged prior to Ms. Howard's bankruptcy petition, and an insurance claim approximating $5,000 remains uncollected for that damage; and

WHEREAS, the couple resided during the marriage in a home at 307 N. Elam, Greensboro NC, ("The Elam Property") which was owned by Ms. Howard prior to the marriage; and

1

WHEREAS, Mr. Miller contends that he has an Equitable Distribution claim to the value of his contribution to equity in the Elam home, but does not have claim to the asset itself; and

WHEREAS, Ms. Howard and Mr. Miller jointly contracted with State Farm to insure the home, and the home was damaged prior to separation and Mr. Miller informs the Trustee that Ms. Howard and Mr. Miller jointly contracted with Property Loss Public Adjuster to represent them as to this damage, and that approximately $100,000 of this claim remained unpaid as of the date of Petition, and that Ms. Howard, Mr. Miller, and Property Loss Public Adjuster are all loss payees on this claim (all such claims and interests and loss payee designations being called the "Elam Insurance Claims"); and

WHEREAS, Mr. Miller desires to retain the three Jointly-Owned Properties and have them titled in his name only; and

WHEREAS, Mr. Miller desires to purchase Ms. Howard's interest in Flagship from the Trustee; and

WHEREAS, Mr. Miller and Flagship are willing to release all interests that would interfere with the Trustee's ability to derive benefit for the Bankruptcy Estate from the Elam Property or the Elam Insurance Claims thereon or both; and

WHEREAS, Mr. Miller has made an offer to purchase the bankruptcy estate's interest in the Jointly-Owned Properties and in Flagship from the Trustee; and

WHEREAS, the Trustee has evaluated Mr. Miller's offer and believes it to be in the best interest of Ms. Howard's bankruptcy estate.

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which the parties hereby acknowledge, the parties agree, contract, and covenant as follows:

1. **Payment by Mr. Miller and/or Flagship.** Upon approval of this Agreement by the Bankruptcy Court, Mr. Miller and Flagship shall purchase the Debtor's interest in the Jointly Owned Properties and in Flagship from the Trustee for the total sum of fifty thousand dollars ($50,000.00) (the "Purchase Amount"), payable in a lump sum at closing. The closing shall occur on a date no more than sixty (60) days following court approval of this Agreement or an amended version of this Agreement.

2. **Delivery by the Trustee.** At closing, in exchange for the Purchase Amount, the Trustee shall deliver to Mr. Miller the following (collectively, the "Transferred Assets"):

    a. A quitclaim deed to the property located at 442 Aldridge Road, Banner Elk, NC, transferring all interest of the Debtor in that property;

    b. A quitclaim deed to the property located at 23252 Sudie Payne Road, Rodanthe, NC, transferring all interest of the Debtor in that property;

    c. A quitclaim deed to the property located at 1234 Carondelet Street, New Orleans, LA, transferring all interest of the Debtor in that property;

    d. Transfer of Debtor's entire interest in Flagship to Mr. Miller, including any exempted interest. The Purchase Amount shall be allocated among the Transferred Assets in the amount of $12,500 to each of the four Transferred Assets or otherwise as specified by Trustee.

**3.**     **Status of the Transferred Assets.** The Transferred Assets from the Trustee listed in Paragraph 2 are subject to all liens, encumbrances, claims, or other clouds or defects that might exist. The Trustee is transferring all interest he has in the Transferred Assets, and such transfers are strictly "AS IS." The Trustee makes no representations or warranties as to the titles to the Transferred Assets.

**4.**     **Representations and Warranties of Mr. Miller.** Mr. Miller represents and warrants that he has fully disclosed to the Trustee the financial condition of Flagship, including the minimal cash on hand that Flagship had as of the petition date. Mr. Miller further represents that Flagship's income since the petition date has been used to pay past due debt of the Company as well as ongoing obligations of the Company to keep the properties in a condition where they can be rented and generate income. Mr. Miller agrees that, in consideration of the transfer of the Flagship membership interest listed above, Mr. Miller, who is the majority interest holder in Flagship and will be the sole interest holder in Flagship, will not cause Flagship to issue any Schedule K-1 to the Debtor or the Trustee either for the 2019 or 2020 tax years. Finally, Mr. Miller agrees that Flagship will indemnify the Trustee and/or the bankruptcy estate in the event that this transaction results in any tax consequences to the bankruptcy estate. This indemnification provision does not apply to any forgiveness of debt income that may be assigned to the Debtor by the lien holders on any of the Jointly-Owned Properties resulting from Mr. Miller's negotiations with those lenders.

**5.**     **Release of Claims by Mr. Miller.** Upon delivery of the Transferred Assets described in Paragraph 2 above, Mr. Miller shall release and hereby releases (1) his participation in any claim for repairs to the Elam Property and his claim for insurance proceeds in connection with the Elam Property including but not limited to the Elam Insurance Claims and (2) any claims he has to funds derived from equity in the Elam Property. Therefore, the Trustee can receive from State Farm all sums due or payable by State Farm related to the Elam Insurance Claims.

**6.**     **Release of Claims by the Trustee.** Upon delivery of the Purchase Amount described in Paragraph 1 above, the Trustee hereby releases (1) any claims the Debtor has or might have to repair funds for the Dodge Challenger, and (2) any claims the Debtor has or might have to the Jointly Owned Properties, the membership interest in Flagship, and/or to any property owned by Flagship.

**7.**     **Default.** In the event that Mr. Miller is unable to close and therefore defaults on this Agreement, then Mr. Miller agrees to take all actions necessary to sell, under Trustee's supervision and jointly with Trustee, of as many Transferred Assets as required to provide $50,000 to the Bankruptcy Estate. Further, Mr. Miller's release of claims in Paragraph 5 shall remain in effect. Notwithstanding the foregoing, Mr. Miller is expressly not in default if he is willing and able to close but is prevented from doing so by the Bankruptcy Court or the Trustee.

**8.**    **No Admissions.** Nothing in this agreement shall be construed as an admission or concession on the part of Mr. Miller or Ms. Howard.

**9.**    **No Waiver of Direct Claims.** Except as expressly stated herein, nothing in this agreement shall be construed as a waiver on the part of Mr. Miller of any claim he or Flagship may have against Ms. Howard personally; except that no such claim shall obstruct or interfere with the Bankruptcy Trustee's administration of the Estate. Except as expressly stated herein, nothing in this agreement shall be construed as a waiver on the part of Ms. Howard of any claim she may have against Mr. Miller personally or against Flagship.

**10.**    **Authority.** The parties hereby represent and warrant to each other that (i) they have the power and authority to execute and deliver this Agreement, (ii) they have obtained all necessary authorizations to enter into this Agreement, (iii) the execution of this Agreement does not put them in violation of any agreement to which they are a party, and (iv) this Agreement constitutes a legal, valid, and binding obligation enforceable upon the parties in accordance with its terms.

**11.**    **Attorneys' Fees and Costs.** Each party hereto shall bear all attorneys' fees and costs arising from the actions of its own counsel in connection with this Agreement and all matters and documents referred to herein except as specifically provided in such documents.

**12.**    **Reading of Agreement.** In entering into this Agreement, all parties represent that they have completely read all terms herein, which are fully understood and voluntarily accepted by them, and that they have been adequately represented by counsel of their choice.

**13.**    **Applicable Law, Jurisdiction, and Venue.** This Agreement and all exhibits attached hereto shall be construed and enforced in accordance with federal bankruptcy laws as applied in the Middle District of North Carolina, and the laws of the State of North Carolina. All parties hereto submit to the jurisdiction of the federal bankruptcy court in any action, suit, or proceeding brought by or against such party in connection with, arising from, or relating to this Agreement. Each party hereby waives and further agrees not to assert as a defense in any such suit, action, or proceeding any claim that such party is not personally subject to the jurisdiction of any such courts; that the venue of the suit, action, or proceeding is brought in an inconvenient forum; or that this Agreement or the subject matter hereof may not be enforced in or by such courts.

**14.**    **Bankruptcy Stay.** This Agreement is contingent on the Bankruptcy Court's continuance of the Stay precluding foreclosure sale on the Jointly-Owned Properties until after the closing date of this agreement, and this Agreement is null and void if such continuance of the Stay is not obtained until then; however, Flagship agrees to make monthly Adequate Protection payments in the amount of the loans' regular monthly payments to the properties' mortgagors during the stay.

**15.**    **Bankruptcy Court Approval.** This Agreement is subject to the approval of the Bankruptcy Court and is null and void if such approval is not obtained.

16.   **Miscellaneous.** This Agreement and all exhibits attached hereto (a) contain the entire agreement between the parties and supersede all prior or contemporaneous, written or oral negotiations, agreements, promises, or understandings between the parties; (b) may not be amended or modified except in writing signed by an authorized representative of the party against whom the amendment or modification is sought to be enforced; and (c) shall be executed in two or more counterparts each of which shall be deemed an original.  Facsimile or .pdf signatures shall be binding as if original.

17.   **Settlement Documentation**.   The parties and their counsel shall prepare and execute any further settlement documentation which is necessary to carry out the terms of this Agreement.

Fully executed by the parties, under seal as of the day and date set forth above.


**YITZHAK MILLER**

_____ (Seal)


**EVERETT B. SASLOW, JR., TRUSTEE**

_____ (Seal)

## EXHIBIT E: FLAGSHIP VACATION PROPERTIES, LLC
## OPERATING AGREEMENT

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

_Flagship Vacation Prop_(COMPANY NAME), LLC

A Member-Managed Limited Liability Company

# NORTH CAROLINA LLC OPERATING AGREEMENT

THIS OPERATING AGREEMENT is made and entered into effective _August 14, 2018_ (Month Day, Year), by and among: _Yitzhak J. Miller_ (Member Full Name), _Melodie L. Howard_(Member Full Name), and _N/A_ (Member Full Name) (collectively referred to in this agreement as the "Members").

## SECTION 1
### THE LIMITED LIABILITY COMPANY

1.1 **Formation**. Effective _August 2, 2018_ (Month Day, Year), the Members form a limited liability company under the name _Flagship Vacation Prop_(Company Name), L.L.C. _Flagship Vacation Properties_ (the "Company") on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to Chapter 57D North Carolina Limited Liability Company Act (State Law) of the State of North Carolina (the "Act"). The Members agree to file with the appropriate agency within the State of North Carolina charged with processing and maintaining such records all documentation required for the formation of the Company. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement.

1.2 **Name**. The business of the Company will be conducted under the name _Flagship Vacation Prope_(Company Name), L.L.C., or such other name upon which the Members may unanimously may agree.

1.3 **Purpose**. The purpose of the Company is to engage in any lawful act or activity for which a Limited Liability Company may be formed within the State of North Carolina.

1.4 **Office**. The Company will maintain its principal business office within the State of North Carolina at the following address: _307 N. Elam Ave. Greensboro, NC 27403_ (Address, City, State Zip).

1.5 **Registered Agent**. _Yitzhak J. Miller_ (Full Name) is the Company's initial registered agent in the State of North Carolina, and the registered office is _307 N. Elam Ave. Greensboro, NC 27403_ (Address, City, State Zip).

1.6 **Term**. The term of the Company commences on _August 2, 2018_ (Month Day, Year) and shall continue perpetually unless sooner terminated as provided in this

**1.7 Names and Addresses of Members**. The Members' names and addresses are attached as Schedule 1 to this Agreement.

**1.8 Admission of Additional Members**. Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

## SECTION 2

## CAPITAL CONTRIBUTIONS

**2.1 Initial Contributions**. The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement.

**2.2 Additional Contributions**. No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

**2.3 No Interest on Capital Contributions**. Members are not entitled to interest or other compensation for or on account of their capital contributions to the Company except to the extent, if any, expressly provided in this Agreement.

## SECTION 3

## ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

**3.1 Profits/Losses**. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation 1.704-1.

**3.2 Distributions**. The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(d).

**3.3 No Right to Demand Return of Capital**. No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

## SECTION 4

## INDEMNIFICATION

The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of

the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful

## SECTION 5

## POWERS AND DUTIES OF MANAGERS

## 5.1 Management of Company.

5.1.1 The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs.

5.1.2 Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed by a Majority in Interest of the Members.

5.1.3 Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a Majority in Interest of the Members to manage and operate the business and affairs of the Company.

5.2 *Decisions by Members.* Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall mean a Majority of the Members.

5.3 *Withdrawal by a Member.* A Member has no power to withdraw from the Company, except as otherwise provided in Section 8.

## SECTION 6

## SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1 **Organization Expenses.** All expenses incurred in connection with organization of the Company will be paid by the Company.

6.2 **Salary.** No salary will be paid to a Member for the performance of his or her duties under this Agreement unless the salary has been approved in writing by a Majority of the Members.

6.3 **Legal and Accounting Services.** The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

## SECTION 7

## BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS.

## FISCAL YEAR, BANKING

*7.1* **Method of Accounting.** The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

**7.2 Fiscal Year; Taxable Year.** The fiscal year and the taxable year of the Company is the calendar year.

**7.3 Capital Accounts.** The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

**7.4 Banking.** All funds of the Company will be deposited in a separate bank account or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government.

## SECTION 8

## TRANSFER OF MEMBERSHIP INTEREST

8.1 **Sale or Encumbrance Prohibited.** Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the other non-transferring Members determined on a per capita basis.

8.2 **Right of First Refusal.** Notwithstanding Section 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1 The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2 For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3 Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

8.2.4 If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the

remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the 30-day period describe above, then the provisions of Section 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5 Notwithstanding the foregoing provisions of Section 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Section 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3 **Substituted Parties.** Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

8.3.1 The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

8.3.2 The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4 **Death, Incompetency, or Bankruptcy of Member.** On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the other Members determined on a per capita basis admit the transferee as a fully substituted Member in accordance with the provisions of Section 8.3.

8.4.1 Any transfer of Economic Rights pursuant to Section 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5 **Death Buy Out.** Notwithstanding the foregoing provision of Section 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 180 days of the

death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Section 8.5.

8.5.1 The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2 If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3 Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Section 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's

death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4 At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company. If the purchase price is less than $1,000.00, the purchase price will be paid in cash; if the purchase price is $1,000.00 or more, the purchase price will be paid as follows:

(1) $1,000.00 in cash, bank cashier's check, or certified funds;

(2) The balance of the purchase price by the Company executing and delivering its promissory note for the balance, with interest at the prime interest rate stated by primary banking institution utilized by the Company, its successors and assigns, at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

8.5.5 At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6 On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then existing Ownership Interests.

## SECTION 9

## DISSOLUTION AND WINDING UP OF THE COMPANY

9.1 **Dissolution.** The Company will be dissolved on the happening of any of the following events:

9.1.1 Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2 The agreement of all of the Members;

9.1.3 By operation of law; or

9.1.4 The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of

Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2 **Winding Up**. On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Section 3 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1 To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members;

9.2.2 To the payment and discharge of any Company debts and liabilities owed to Members; and

9.2.3 To Members in the amount of their respective adjusted Capital Account balances on the date of distribution; provided, however, that any then outstanding Default Advances (with interest and costs of collection) first must be repaid from distributions otherwise allocable to the Defaulting Member pursuant to Section 9.2.3.

## SECTION 10

## GENERAL PROVISIONS

10.1 **Amendments**. Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all of the Members.

10.2 **Governing Law**. This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of North Carolina (without regard to principles of conflicts of law).

10.3 **Entire Agreement; Modification**. This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

10.4 **Attorney Fees**. In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

10.5 **Further Effect**. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.6 **Severability**. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.7 **Captions**. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.8 **Notices**. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

IN WITNESS WHEREOF, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

MEMBERS:

Itzhak T. Miller
Printed/Typed Name

Melodie L. Howard
Printed/Typed Name

Printed/Typed Name

Signature

Melodie L. Howard
Signature

Signature

**Listing of Members - Schedule 1**

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
FOR Flagship Vacation Properti(COMPANY NAME), L.L.C.
### LISTING OF MEMBERS

As of the 14 (Day) day of August , 2018 (Month, Year), the following is a list of Members of the Company:

| NAME | ADDRESS |
| --- | --- |
| Yitzhak. J. Miller | 307 N. Elam Ave. Greensboro, NC 27403 |
| Melodie L. Howard | 307 N. Elam Ave. Greensboro NC 27403 |
| | |
| | |

Authorized by Member(s) to provide Member Listing as of this (Day) day of (Month, Year).

| mone | |
| --- | --- |
| Printed/Typed Name | Signature |
| Printed/Typed Name | Signature |
| Printed/Typed Name | Signature |

**Listing of Capital Contributions - Schedule 2**
LIMITED LIABILITY COMPANY OPERATING AGREEMENT
FOR Flagship Vacation Properties (COMPANY NAME), L.L.C.
CAPITAL CONTRIBUTIONS

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is
stated to be $100. The description and each individual portion of this initial contribution
is as follows:

| NAME | CONTRIBUTION | % OWNERSHIP |
|------|--------------|-------------|
| Yitzhak Miller (Member) | $ 91.67 | 50 % |
| Melodie L. Howard (Member) | $ 8.33 | 50 % |
| (Member) | $ | % |

SIGNED AND AGREED this 14 (Day) day of August , 20 18 (Month, Year).

Yitzhak J. Miller
Printed/Typed Name

Signature

Melodie L. Howard
Printed/Typed Name

Melodie L Howard
Signature

Printed/Typed Name

Signature

**Listing of Valuation of Members Interest - Schedule 3**
LIMITED LIABILITY COMPANY OPERATING AGREEMENT
FOR Flagship Vacation Prop (COMPANY NAME), L.L.C.
VALUATION OF MEMBERS INTEREST

Pursuant to ARTICLE 8, the value of each Member's interest in the Company is
endorsed as follows:

NAME                                    VALUATION ENDORSEMENT

Yitzhak J. Miller                       $ 550,000.00

Melodic L. Howard                       $ 50,000.00

                                        $

SIGNED AND AGREED this 14 (Day) day of August , 20 18 (Month, Year).

Yitzhak J. Miller
Printed/Typed Name                      Signature

Melodie L. Howard                       Melodie L. Howard
Printed/Typed Name                      Signature

Printed/Typed Name                      Signature

## NOTARY SEAL OF ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the
> individual who signed the document to which
> this certificate is attached, and not the
> truthfulness, accuracy, or validity of that
> document.

State of _North Carolina_

County of _Guilford_ )

On _14th August 2018_ before me, _Jose Gonzalez Razo_ (insert name)
personally appeared _Melodie Lea Howard & Rabb_, who proved to me on the basis
of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _North Carolina_
that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
(Seal)

JOSE GONZALEZ RAZO
Notary Public - North Carolina
Guilford County
My Commission Expires June 28, 2020

## CERTIFICATE OF SERVICE

This is to certify that the undersigned served a copy of the Motion to Approve Sale of Real Property and LLC Interests by depositing the same, enclosed in a postpaid envelope, properly addressed to the following creditors and parties in interest, at their addresses as set forth below, in a post office or official depository under the exclusive care and custody of the United States Postal Service on August 3, 2020, as follows:

Melodie Lea Howard
307 North Elam Avenue
Greensboro, NC 27403

And, pursuant to Local Rule 5005-4(9) regarding service of electronically filed documents, all pleadings and other documents properly filed electronically in a case or proceeding by a Filing User in accordance with the Local Rules and the Administrative Guide shall be deemed served on all other Filing Users who have made an appearance in the case pursuant to Rules 2002 or otherwise for purposes of service under Rule 9022 of the Federal Rules of Bankruptcy Procedure, Rule 5(b) of the Federal Rules of Civil Procedure, or otherwise, except for those pleadings and documents required to be served in the manner provided under Rules 7004(a)-(d) and 9016 of the Federal Rules of Bankruptcy Procedure.

This the 3rd day of August, 2020.

 s/ Everett B. Saslow, Jr.
Everett B. Saslow, Jr.

8